**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

M.A.C.
        Plaintiff

    v.                                     Case No.

MONICA GILDNER, ANGELA WEBB, AND TINA ABNEY,
in their individual capacities
        Defendants
_____

**COMPLAINT**
_____

M.A.C, individually, as Plaintiff, by and through undersigned counsel, alleges and states:

1.      Plaintiff's claims arise under 42 U.S.C. § 1983 from a series of acts leading up to May 6, 2009, at a time when she was a minor child, and was unconstitutionally seized in Douglas County, Colorado, at a private home and wrongfully detained for five days in Kansas. Defendants' actions were conducted under color of state law, without due process or probable cause, and as the result of a conspiracy, depriving Plaintiff of liberty, familial association, the right to travel, and to be free from malicious prosecution and abuse of process

**JURISDICTION AND VENUE**

2.      Jurisdiction is authorized under 42 U.S.C. § 1983 (civil rights), 28 U.S.C. §1331 (authority for civil actions), 28 U.S.C. §1343 (redress for the deprivation of rights).

3.      Venue is proper under 28 U.S.C. § 1391(b)(2), because "a substantial part of the events" giving rise to the claim occurred in the District of Kansas.

**PARTIES**

4.      Plaintiff M.A.C. is over the age of 18, and has brought this suit within 1 year of turning 18. Plaintiff resides in Littleton, Colorado, and brings suit for herself individually.

5.      Defendants Monica Gildner ("Gildner"), Angela Webb ("Webb") and Tina Abney ("Abney") (sometimes collectively the "Defendants"), at the relevant times, acted under color of state law, being then employees of the Kansas Department of Social and Rehabilitation Services, now known as the Kansas Department of Children and Families ("SRS/DCF"), and are sued individually.

6.      At the relevant times herein, Gildner was employed by SRS/DCF as a Social Work Specialist in Johnson County, Kansas.

7.      At the relevant times herein, Webb was a supervisor to Gildner at SRS/DCF, although liability is not sought on the basis of *respondeat superior.*

8.      At the relevant times herein, Abney was a supervisor to Gildner at SRS/DCF, although liability is not sought on the basis of *respondeat superior.*

**FACTUAL ALLEGATIONS**

9.      John Doe ("Mr. Doe") and Jane Doe ("Mrs. Doe") (together, the "Parents"), who are not parties to this suit, are the parents of Plaintiff and nine other children.

10.     Mrs. Doe holds a Bachelor of Science degree in nursing from Franciscan University of Steubenville, Ohio, and has worked as a registered nurse in hospital oncology.

11.     Mr. Doe holds a history degree from Franciscan University in Steubenville, Ohio, and owns a construction/remodeling business.

12.     Prior to moving to Colorado in 2009, the Parents and their ten children resided in Johnson County, Kansas.

13.     The Parents were friends from college days with another couple, Dr. and Mrs. G., who at the times relevant hereto, resided in unincorporated Douglas County, Colorado (the "G.'s").

14.     In the spring of 2008, one of the younger of ten Doe children began exhibiting troubling behavior and making troubling comments.

15.     The said child's comments implicated a relative on Mrs. Doe's side of the family of taking improper liberties with the child more than two years earlier, i.e., in 2006 or before.

16.     The Parents voluntarily made arrangements for counseling for the reporting child and for certain siblings who may have witnessed the crimes.

17.     By June of 2008, the Parents had learned sufficient details to decide to make a report to Kansas state authorities at Kansas Department of Social and Rehabilitation Services, now known as the Kansas Department of Children and Families ("SRS/DCF").

18.     The Parents advised SRS/DCF that they had not allowed any of their children to have any contact with the said relative or any other members of Mrs. Doe's family after 2006.

19.     Gildner, Abney and Webb knew the Doe children were not in any present danger of physical abuse or neglect when the report was taken and thereafter, because they knew the suspected relative had not been in contact with the children for some years.

20.     Abney or Webb assigned Gildner to communicate with the Doe family concerning their case.

21.     On or about June 13, 2008, Gildner met with Mrs. Doe at the Doe home to conduct a standard safety assessment of the home.

22.     In June of 2008, Gildner knew that:

a.      the Parents had voluntarily scheduled the child for counseling with a child psychologist, Dr. C.;

b.      Dr. C. was employed by KVC Behavioral Healthcare, an entity approved to receive patient referrals from SRS/DCF;

c.      none of the Doe children was in danger of harm by the relative;

d.      none of the Doe children was in danger of harm or neglect by the Parents.

e.      Mrs. Doe had already conferred with attorneys and clergy.

f.      Gildner's safety assessment of the home revealed no evidence that the Parents were neglecting their children's physical or emotional or other needs.

23.     Gildner was advised early on in her handling of the case that the Does were hoping to move to Colorado and Gildner did not make known to the Parents any objection to their moving.

24.     Gildner never personally conducted a detailed fact finding interview with the reporting child, but "waited for the Sunflower House interview."

25.     The child confirmed her report at a Sunflower House interview on or about July 7, 2008.

26.     Gildner, Abney and Webb utilized Sunflower House to conduct interviews

with three older siblings on or about July 10, 2008.

27.     Gildner closed the SRS/DCF file after law enforcement informed her that criminal charges would not be brought against the relative.

28.     At the time that the SRS/DCF file was closed, Gildner, Webb and Abney knew that the reporting child was "receiving services in the community" through counseling.

29.     At no time was Mrs. Doe under an order by SRS/DCF to obtain counseling for herself.

30.     After SRS/DCF closed its file, the reporting child shared additional, more graphic details of the abuse, which the Parents reported to SRS/DCF.

31.     Gildner referred the child to Sunflower House again on or about November 26, 2008.

32.     Gildner confirmed that the child was receiving counseling at the time of the second Sunflower House interview.

33.     In November of 2008, Gildner re-opened the SRS/DCF file in connection with the reporting child's newly disclosed details.

34.     On or about December 8, 2008, an older child reported abuse by the same relative, which report was made during therapy with Dr. C. and was made known to SRS/DCF.

35.     Gildner received phone messages on January 5 and 6, 2009, from Mrs. Doe.

36.     On or about January 14, 2009, Gildner directed the second-reporting child to Sunflower House to be interviewed regarding her allegations of abuse.

37.     Mr. Doe was present at the said Sunflower House on the day of the interview of the second-reporting child on January 14, 2009.

38.     Gildner took a position that the abuse never occurred.

39.     Instead of verifying with the children's counselor, Dr. C., the validity of the children's independent reports, Gildner engaged on a course of conduct to smear Mrs. Doe.

40.     Gildner knew Mrs. Doe had been seeing a physician for pre-natal and post-delivery care.

41.     Without conferring with Mrs. Doe's physician or any other medical expert, Gildner baselessly pronounced that Mrs. Doe had post-partum depression and mental instability.

42.     Gildner had no medical qualifications to diagnose Mrs. Doe with post-partum depression or mental instability.

43.     Gildner took a position that the Doe children would be harmed if SRS/DCF personnel interviewed them about new details of abuse.

44.     Gildner, disregarding their existing counseling regimen, took a position that the Doe children needed counseling to overcome their supposed false beliefs about the abuse.

45.     Gildner took a position that Mrs. Doe needed counseling to overcome her supposed false beliefs about the abuse.

46.     Mrs. Doe agreed to begin counseling in an effort to satisfy Gildner's outrageous demands that she do so.

47.     Gildner took a position that if the Parents pursued legal action against the

suspect, either civilly, criminally, or through further investigation conducted by SRS/DCF, the children would be harmed by "borderline emotional abuse."

48.    Gildner communicated her positions, set forth above, to Mr. and Mrs. Doe.

49.    Because Gildner disbelieved the children's claims of abuse and had embarked on a smear campaign against Mrs. Doe, Mr. and Mrs. Doe attempted to cease contact with Gildner, even though they themselves had voluntarily initiated the opening of the case with SRS/DCF.

50.    At the time that Mr. and Mrs. Doe attempted to cease contact with Gildner, Gildner, Abney and Webb had no intention of further investigating the children's claims of abuse, and Gildner had taken an adversarial position to the Parents.

51.    Mr. Doe communicated to Webb and Abney that he did not wish to have further contact with Gildner due to the animosity created by her antagonistic, biased and baseless positions.

52.    Webb and Abney refused to replace Gildner with someone different and thereby actively supervised, authorized, agreed to, and participated in Gildner's actions with knowledge of the circumstances.

53.    Gildner contacted Mr. Doe despite knowing that he had asked her superiors to remove her from their case.

54.    After Mr. Doe complained about her, Gildner retaliated by threatening to initiate a court action.

55.    After Mr. Doe complained about her, Gildner further retaliated by requiring that the entire family participate in "Family Preservation Services," intending to cause the Parents and children to stop believing that the children's abuse had occurred.

56.    Gildner met with Webb and Abney, who approved of her taking retaliatory legal action against Mr. and Mrs. Doe and their ten children, thereby actively supervising, authorizing, agreeing to, and participating in Gildner's actions with knowledge of the circumstances.

57.    Gildner "offered Family Preservation Services" to Mr. Doe on or about January 20, 2009.

58.    On or about January 23, 2009, Gildner received a message from Mrs. Doe stating that instead of Family Preservation Services, "she was going to seek counseling services through Catholic Charities."

59.    Gildner made no objection to Mrs. Doe's decision to seek counseling through Catholic Charities instead of through Family Preservation Services.

60.    Following the said message from Mrs. Doe on January 23, 2009, Gildner did not contact the Parents until after Mr. Doe lodged a complaint against her.

61.    Gildner received, on or about February 12 and 23, 2009, two more reports regarding the allegations by the second-reporting child.

62.    Near the end of February 2009, Mr. Doe filed a formal complaint with SRS/DCF concerning Gildner's inaction.

63.    The Defendants' posture was to maintain the social worker, Gildner, who was the subject of the Does' complaint, as the primary contact with the complainant, in this case, Mr. and Mrs. Doe.

64.    Despite his complaint about her, Gildner contacted Mr. Doe, who was "very upset that [Gildner] was the one contacting him . . . because [his complaint] was about the services that [she] was providing and those that [she] was working with."

8

65.     Mr. Doe was concerned that no medical exams were ordered and no follow up interviews were being conducted.

66.     Gildner opposed conducting additional medical exams or interviews.

67.     Gildner sought to have a meeting with Mr. Doe to "discuss [her] concerns about the children being subjected to ongoing interviews and discuss how the family was going to move on from these allegations."

68.     Gildner disbelieved the children's claims of abuse and, in contrast, believed the denials by the suspected relative and the children's maternal grandmother, who was the mother of both Mrs. Doe and the suspected relative.

69.     In talking to Mr. Doe, Gildner threatened him that "if they chose not to meet with us that we would possibly have to staff the case with the District Attorney's Office and possibly get the Court involved if they chose not to participate in services or meet with us to discuss the concerns."

70.     The reason Gildner insisted on meeting with Mr. Doe and imposing Family Preservation Services was to exercise heavy-handed punishment against the Parents for lodging a complaint against Gildner and/or to attempt to disabuse the Parents and their children of the notion that the abuse had occurred.

71.     Gildner knew that Mr. and Mrs. Doe thereafter communicated with Gildner's supervisors, Angela Webb and Tina Abney.

72.     At a "multidisciplinary meeting," Gildner, Abney and Webb recommended that if Mr. and Mrs. Doe refused to meet with Gildner, that she "contact the DA's office for filing a child in need of care petition," according to Gildner's subsequent testimony.

73.     On or about March 10, 2009, a third child of Mr. and Mrs. Doe was

reported to SRS/DCF as having experienced abuse by the same suspected relative.

74.     The recommendation by Gildner, Abney and Webb to file a child in need of care petition was not based on the Doe children needing counseling services, because the children were then already receiving counseling services by a counseling group approved by SRS/DCF.

75.     The recommendation by Gildner, Abney and Webb to file a child in need of care petition was not based on Mrs. Doe not receiving counseling, because she had by then already agreed to receive counseling services through Catholic Charities.

76.     The recommendation by Gildner, Abney and Webb to file a child in need of care petition was not based on concerns for the children's safety because, firstly, the Defendants knew that the Doe children had not been in contact with the suspected relative for more than two years and, secondly, Gildner, Abney and Webb wholly disbelieved the children's reports of abuse.

77.     The recommendation by Gildner, Abney and Webb to file a child in need of care petition was not based on a refusal to accept Family Preservation Services, because Mrs. Doe had agreed to private counseling to which Defendants had voiced no objection, and further, because Defendants had not entered or served a formal order for Family Preservation Services upon the Parents prior to the filing of the child in need of care petitions.

78.     Under K.S.A. 38-2202(d), Plaintiff:

      a.     was not without adequate parental care, control or subsistence;

      b.     was not without care or control necessary for her  physical, mental or emotional health;

      c.     had not been physically, mentally or emotionally abused or neglected or sexually abused by the Parents or grandparents;

      d.     had not been placed for care or adoption in violation of law;

      e.     had not been abandoned nor was she without a known living parent;

      f.     was not in violation of K.S.A. 38-2202(d)(7) through (13).

79.     The recommendation by Gildner, Abney and Webb to file child in need of care petitions was made without probable cause to believe that Plaintiff met the definition for a "child in need of care" under K.S.A. § 2202 (d).

80.     The recommendation by Gildner, Abney and Webb to file a child in need of care petition was made:

      a.     in retaliation for Mr. Doe's formal complaint about Gildner's handling of his children's reports of abuse;

      b.     in an unconstitutional effort to stop Mr. and Mrs. Doe from exercising their rights to pursue criminal and civil claims against the suspected relative;

      c.     as an unconstitutional punishment for allegedly discussing with the children their memories of abuse "outside of a therapeutic setting."

81.     On or about April 20, 2009, Gildner pursued her retaliation against Mr. and Mrs. Doe through Assistant District Attorney Jaclynn J.B. Moore, who filed ten Child-in-Need-of-Care ("CINC") petitions in the District Court for Johnson County, Kansas.

82.     The CINC petitions outrageously requested termination of Mr. and Mrs. Doe's parental rights, appointment of a permanent custodian for Plaintiff and her siblings, temporary removal of Plaintiff and her siblings from their Parents' custody, and

an order of child support.

83.     The basis for filing the ten CINC petitions was Gildner's referral to the DA's office, approved by Webb and Abney, and thereby they actively supervised, authorized, agreed to, and participated in Gildner's actions with knowledge of the circumstances.

84.     None of the CINC petitions sought immediate custody of the children.

85.     None of the CINC petitions prohibited travel by the Doe Parents and children nor did any court order prohibit custody by the Parents and travel by the family.

86.     None of the CINC petitions set forth the fact that Mr. Doe had made a formal complaint about Gildner to SRS/DCF.

87.     All of the CINC petitions left Mr. and Mrs. Doe with unlimited custody of their children.

88.     The CINC petitions, filed on April 20, 2009, were set for a non-emergency hearing three weeks later, on May 11, 2009.

89.     On April 20, 2009, and thereafter, no emergency threatened the safety or health of the Plaintiff or their siblings.

90.     According to Gildner's testimony, Mr. Doe contacted Abney on or about April 28, 2009, to agree to participate in Family Preservation Services.

91.     According to Gildner's testimony, Abney took no action to schedule Family Preservation Services and instead referred Mr. Doe to contact either Gildner or Webb.

92.     On April 28, 2009, no emergency existed so as to require Abney to schedule Family Preservation Services or have the children seized.

93.     According to Gildner's testimony, Mr. Doe reiterated to Webb on or about

April 29, 2009, his willingness to participate in Family Preservation Services.

94.    According to Gildner's testimony, Webb took no action to schedule Family Preservation Services and instead referred Mr. Doe again to Gildner, who would be in the office April 30, 2009.

95.    On April 29, 2009, no emergency existed so as to require Webb to schedule Family Preservation Services or have the children seized.

96.    On or about April 30, 2009 or May 1, 2009, Gildner took a call from someone in the suspected relative's family who was wondering if the Parents and children had left town. But even if they had left town, there was no order in place preventing them from so doing, and Defendants had no reason to believe that Plaintiff was in immediate danger from her Parents and Grandparents, and Defendants therefore, took no action on those dates to have Plaintiff seized.

97.    On or about April 30, 2009, Gildner left a message on Mr. Doe's cell phone about "Family Preservation Services."

98.    Other than leaving a message on Mr. Doe's cell phone on April 30, 2009, Gildner made no further effort to contact the Parents prior to May 4, 2009.

99.    On May 1, 2, 3 and 4, Defendants knew that no emergency existed that required Gildner to attempt to schedule Family Preservation Services or have the children seized, even though all Defendants had information that the Doe family was in Littleton, Colorado as of May 2, 2009, because Defendants had no reason to believe the Parents would not appear at the CINC hearing on May 11, 2009.

100.   On or about Monday May 4, 2009, Gildner was aware that members of the Doe family were in Colorado, but decided to make an uninvited visit to the Doe home,

where she was met by Mr. Doe as she was getting out of her car.

101.   Mr. Doe instructed Gildner that all contact needed to be through his attorney, whose name he provided to Gildner.

102.   Gildner failed and refused to call the Does' attorney.

103.   At no time did SRS/DCF, Gildner, Webb or Abney advise Mr. or Mrs. Doe that they were prohibited from traveling out of town prior to the CINC hearing scheduled for May 11, 2009.

104.   In fact, Mrs. Doe and the ten children were visiting the home of college friends, Dr. and Mrs. G., who resided in unincorporated Douglas County, Colorado.

105.   In fact, Mr. Doe provided the precise address to the Overland Park, Kansas, police department who had asked him for the Colorado address where the children were visiting.

106.   In fact, Gildner did not attempt to contact the children's court-appointed guardian *ad litem*, who also was aware of the Does' travel to Colorado, prior to seeking the *Ex Parte* orders, described below.

107.   On Tuesday May 5, 2009, SRS/DCF through Gildner, Abney and Webb sought *Ex Parte Orders of Protective Custody* in the District Court of Johnson County, Kansas, and a redacted copy of one, by way of example, is attached hereto and incorporated by reference herein as **Exhibit 1** (the "*Ex Parte* Orders").

108.   At the time they sought the *Ex Parte* Orders, Gildner, Abney and Webb knew that Plaintiff and the other Doe children were not in danger of physical harm by their parents or the relative or by any other known danger, and they knew the precise address of the children's location at Dr. and Mrs. G's home, which address they

themselves provided to the Colorado Agents, described below.

109.   Defendants' reason for seeking the *Ex Parte* Orders, according to the District Attorney's filing, was "predicated upon the actions of the family **since** the filing of the CINC petitions" (emphasis added), specifically, the family's trip to Colorado prior to the hearing set for May 11, 2009, which trip Defendants knew was not prohibited by the CINC proceedings. Nevertheless, Defendants, in their supposed filing to the CINC court on May 4, 2009, represented to the Court that "an emergency exists based upon the fleeing nature of the departure of the family from the State of Kansas."

110.   Neither Mr. Doe, who was in Kansas and available for service of process, nor Mrs. Doe, whose precise location in Colorado was known by Defendants and who also was available for service of process there, was afforded notice and opportunity to be heard at a hearing prior to the entry of the *Ex Parte* Orders.

111.   No exigency existed to prevent service of process upon Mr. and Mrs. Doe prior to a hearing on the *Ex Parte* Orders, because on the same day, May 4, 2009, that Defendants sought the *Ex Parte* Orders, Gildner had personally talked to Mr. Doe at his home and was told to contact the Does' attorney. .

112.   On information and belief, Gildner, Abney and/or Webb fraudulently misrepresented to the court the factual basis for obtaining the *Ex Parte* Orders and participated in intentionally crafting the language of the *Ex Parte* Orders to make it appear that an immediate danger to the children existed when Defendants knew in fact that no such immediate danger existed or, in the alternative, they had no facts upon which to form a reasonable suspicion that Plaintiff was in immediate danger from the Parents and Plaintiff's grandparents, because Defendants all knew that Gildner

disbelieved that the children had been abused at all, and furthermore, that said abuse had taken place three years earlier by a relative who had not had any subsequent contact with the children.

113.   The *Ex Parte* Orders falsely state (or insinuate in a manner intended to alarm and mislead):

a.   that the Parents had committed physical, sexual, mental or emotional abuse of their children <u>when in fact</u> such a statement had no basis in the facts alleged in the CINC petitions or in the facts known to Gildner, Abney and Webb;

b.   that Mr. and Mrs. Doe had refused Family Preservation Services <u>when in fact, according to Gildner's testimony,</u> Mr. Doe had specifically accepted the offer of Family Preservation Services by contacting Abney on April 28, 2009, and Webb on April 29, 2009;

c.   that an emergency existed which threatened the safety of the children <u>when in fact</u> Gildner, Abney and Webb knew that the safety of the Doe children was never in question prior to, or upon filing of, the request for the *Ex Parte* Orders as evidenced by Gildner's testimony and her actions including but not limited to:

(1)   initially closing the SRS/DCF file,

(2)   disbelieving that the childrens' abuse two years earlier had occurred at all,

(3)   filing CINC petitions only after Mr. Doe had lodged a complaint against Gildner;

(4)   not seeking immediate custody upon filing the CINC petitions; and

(5)   failing and refusing to contact the Parents' attorney or the children's

guardian *ad litem* prior to seeking the *Ex Parte* Orders.

       d.    that Mr. Doe "would not provide any information on the whereabouts of the children" <u>when in fact</u>, according to Gildner's own subsequent testimony at the hearing on May 11, 2009, Mr. Doe personally instructed Gildner to contact the Parents' attorney on May 4, 2009, but Gildner intentionally refused or recklessly failed to make any such contact with the Does' attorney prior to seeking the *Ex Parte* orders;

       e.    that "the whereabouts and safety of the children [were] unknown" <u>when in fact</u> Gildner, Abney and Webb knew all along that Mrs. Doe and children had gone to Colorado and, furthermore, that Gildner, Abney and Webb made no effort to obtain information from the children's court-appointed *guardian ad litem*, and that <u>in fact</u> the children's safety in the Parents' custody was not in question.

114.    No exigency existed to prevent the proper completion of an application and written affidavit in support of the *Ex Parte* Orders.

115.    On information and belief, Gildner, Abney and Webb intentionally or recklessly failed to disclose material facts that, but for their omission, would have resulted in a denial of the issuance of the *Ex Parte* Orders*,* including but not limited to the following:

       a.    that the CINC petitions <u>contained no prohibition</u> against travel by the Parents and children before May 11, 2009 (the CINC hearing date);

       b.    that the request for *Ex Parte* orders was <u>in retaliation</u> for Mr. and Mrs. Doe's complaint against Gildner and/or for their retaining counsel to represent them before the SRS/DCF;

c.      that Gildner, Abney and Webb had <u>failed to contact</u> either the children's court-appointed guardian *ad litem* or Mr. and Mrs. Doe's attorney prior to seeking the *Ex Parte* Orders*;*

d.      that Gildner, Abney and Webb <u>disbelieved that any sexual abuse</u> had occurred at all;

e.      that Gildner, Abney and Webb <u>had no reasonable suspicion</u> to believe that Plaintiff or any of the  Doe children was in imminent danger of physical harm or neglect;

f.      that Plaintiff and the other Doe children <u>did not meet the definition</u> of "child[ren] in need of care" under K.S.A. § 38-2202(d).

116.    The *Ex Parte* Orders:

a.      did not order that the State of Kansas or Colorado or any other persons other than Mr. and Mrs. Doe take custody of the Doe children;

b.      did not order that Mr. and Mrs. Doe were prohibited from direct physical and verbal contact with their children;

c.      did not order that Mrs. Doe was prohibited from indirect communication with her children;

d.      did not order Mrs. Doe to be forcibly removed from the children's presence;

e.      did not order that Mrs. Doe was prohibited from kissing her children and telling them goodbye prior to being forcibly removed from their  presence;

f.      did not order that a so-called "safety plan" be imposed summarily;

g.      did not order that that Mr. Doe could not have phone contact with

the children;

        h.    did not order that the children's paternal grandparents ("Grandparents") were prohibited from contacting the Doe children.

117.    On information and belief, any application for the *Ex Parte* Orders lacked any objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish probable cause that Plaintiff was being abused or neglected, or that she was in immediate danger or imminent peril of abuse, as indicated by the fact that material portions of the forms were left entirely blank, failed to authorize anyone besides Plaintiff's Parents to have custody of Plaintiff, failed to prohibit the Parents and Grandparents from contact or custody of the children; and failed to "<u>recite the facts upon which a conclusion of imminent serious physical harm or removal from the jurisdiction is based</u>," in violation of K.S.A. 23-37,311(c)(1) (the Kansas UCCJEA).

118.    At the time that Gildner, Abney and Webb sought the *Ex Parte* Orders, clearly established law required that they have an objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish probable cause that Plaintiff was being abused or neglected, or that she was in immediate danger or imminent peril of abuse.

        a.    Through a formal or informal mutual and reciprocal agreement between agencies and/or with the individual government employees in Douglas County, Colorado, Gildner, Abney and Webb knowingly and/or recklessly conspired to circumvent the legislative and constitutional requirements contained in the *Uniform Child Custody and Jurisdiction Enforcement Acts* of Kansas and Colorado. K.S.A. 23-37,310 through 23-307,317 and C.R.S. §14-13-101 through 14-13-403 (the "UCCJEA").

b. The UCCJEA, Section 204, enacted by both states, provides that a child "present" in Colorado is subject to a Colorado court's jurisdiction IF "necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse."

c    Defendants knew that Plaintiff and her siblings, while in Colorado, were not "threatened with mistreatment or abuse" by their Parents and/or Grandparents or anyone else, and moreover, Defendants denied that any Doe children, three years earlier or at any time prior to being seized, had been "subjected to mistreatment or abuse" by anyone.

119.   Gildner, Abney and Webb acted with plain incompetence, or in knowing violation of the law, in applying for the *Ex Parte* Orders without any objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish the requisite probable cause to believe that the Plaintiff was in immediate danger.

120.   On May 6, 2009, while Mr. Doe was in Kansas, Mrs. Doe and all of the Doe children were visiting Dr. and Mrs. G.'s quiet suburban home in Douglas County, Colorado.

121.   On said day, the Doe children ranged in ages from 6 months to 13 years old.

122.   Lesa Adame, at the relevant times, was a social worker acting under color of state law, being then an employee of the Colorado Department of Social Services and/or Douglas County Department of Human Services. ("Adame").

123.    Carl Garza, at the relevant times, acted under color of state law, being

then an employee of the Douglas County, Colorado, Sheriff's Office. ("Garza").

124.    On May 6, 2009, Adame and Garza went together to the G.'s home to carry out official business on behalf of the Douglas County Sheriff's Office, the Department of Human Services for Douglas Colorado, and the Colorado Department of Social Services, doing so at the instigation of Gildner, Abney and Webb.

125.    When Garza arrived at the G.'s home, he stopped in front of the house where his patrol car was visible for the inhabitants and the neighbors to see.

126.    On information and belief, prior to arriving at the G.'s home, Garza and Adame had done no independent investigation to determine that probable cause existed to believe that Plaintiff was in immediate danger of harm.

127.    Garza and Adame approached the G.'s property as a team to ring the doorbell.

128.    Someone other than Dr. G. answered the doorbell, and called Dr. G. to the front door from another room in the house.

129.    Garza was wearing a visible sidearm when Dr. G. greeted him.

130.    Dr. G. stepped outside his house to find out why Garza and Adame were there.

131.    Standing outside of the G.'s house, Garza and/or Adame (sometime, collectively, the "Colorado Agents") represented that they were in possession of a court order from the State of Kansas to seize custody of all ten of the Doe's children, and demanded entry and custody of the children.

132.    Adame represented to Dr. G. that she had been contacted by the Kansas SRS/DCF.

133.    Defendants knew that the Colorado Agents did *not* possess an order from a Colorado court authorizing their actions at the G.'s home.

134.    After calling an attorney-friend by telephone, Dr. G. asked the Colorado Agents to produce a warrant that authorized them to enter his home or to produce any order from a Colorado court authorizing their demands.

135.    One or more of the Colorado Agents represented to Dr. G. that they were not required to obtain a warrant to have legal authority to enter the G.s' home.

136.    One or more of the Colorado Agents further stated to Dr. G., or stated in words to the effect that, "We do this all the time".

137.    When Dr. G. expressed doubt about the Colorado Agents' authority to enter his home, Garza became belligerent, began raising his voice, and threatened Dr. G. with arrest or contempt for interfering with law enforcement.

138.    Garza further threatened Dr. G. with words, or words to the effect that, "I don't care what your lawyer says, we're coming in and we're taking these kids."

139.    Due to the Colorado Agents' visible weapon, their false claims of legal authority, their use of threats, intimidation, and loud and belligerent demeanor, Dr. G. was powerless to prevent them from entering his house over his objection.

140.    Inside the G.'s house, the Colorado Agents saw no emergency conditions that threatened the safety of Plaintiff and the other Doe children.

141.    Despite there being no emergency requiring it, the Colorado Agents, at the behest of the Defendants and in conspiracy with them, commanded Mrs. Doe to vacate the G.'s house immediately, causing tremendous distress and anxiety to Plaintiff and her siblings.

142.    The Colorado Agents falsely claimed, at the behest of the Defendants and in conspiracy with them, that Plaintiff and the other Doe children were then and there in the legal custody of the State of Kansas.

143.    In fact, the Colorado Agents had every opportunity to observe for themselves that there was no valid order placing the Doe children into the legal custody of the State of Kansas.

144.    The Colorado Agents falsely claimed, at the behest of the Defendants and in conspiracy with them, that Mrs. Doe was "high risk" or used similar words to malign her in front of the Doe children.

145.    At the behest of the Defendants and in conspiracy with them, the Colorado Agents issued summary orders inside the G.'s house, both verbal and written, without a supporting court order, without prior notice, hearing or probable cause, which the G's, Mrs. Doe and the Doe children were forced to obey by virtue of the Colorado Agents' threats of force, intimidation and false claims of legal authority,

146.    Inside the G.'s house, at the behest of the Defendants and in conspiracy with them, Adame signed a hand-written document, a redacted copy of which is attached as **Exhibit 2** (the "Colorado Order").

147.    At the top of the Colorado Order are the names "Colorado Department of Social Services" and "Douglas County Department of Human Services." However, the contents of the Colorado Order were created at the behest of the Defendants and in conspiracy with them.

148.    The Colorado Order, paragraph 3, states: "The children are currently in the custody of Kansas State Social Services."

149.   In fact, the Defendants and the Colorado Agents had no reasonable suspicion or probable cause to believe that the Doe children were in the legal custody of Kansas State Social Services, based on the plain and obvious language of the *Ex Parte* Orders.

150.   The Colorado Order required the G.'s to take temporary physical custody of the Doe's children and in paragraph 5, to "follow through with this safety plan . . ."

151.   The Colorado Order, paragraph 2, states: "[Mrs. Doe] will have no contact, physical or verbal with any of the children, including any communication through Dr. G. and his wife Mrs. G. or any 3rd party."

152.   In a later phone call from Adame to Dr. G., she verbally added other prohibitions to the Colorado Order, prohibiting Dr. G. from allowing Mr. Doe, or even Mr. Doe's parents, to talk to the children on the phone or to have any contact with them.

153.   Adame's additional verbal orders were issued at the behest of and in conspiracy, cooperation and agreement with Gildner, Abney and/or Webb.

154.   Adame's written and verbal orders were outside the scope of the obviously defective and incomplete Kansas *Ex Parte* Orders.

155.   At the behest of the Defendants and in conspiracy with them, Adame issued written and verbal orders that were outside of her authority under Colorado law.

156.   Neither Defendants nor Adame had reasonable suspicion to believe that she had legal authority to issue the verbal and written prohibitions contained in the Colorado Order.

157.   Inside the G.'s house, the Defendants' actions in conspiring with Adame and Garza caused panic and severe emotional distress to Plaintiff and the other Doe

24

children, who were weeping and distraught that their mother was forced to leave them with no explanation, reassurances, hugs or kisses due to the cruel and outrageous prohibitions by Adame and Garza, which were instigated by Gildner, Abney and Webb.

158.   At the time they delivered the Colorado Order, at the behest of the Defendants and in conspiracy with them, the Defendants, through their co-conspirators, the Colorado Agents, were on notice or reasonably should have been on notice, that the Does' baby was suffering from a rash, that other children were taking prescription antibiotics to treat strep throat conditions, and that other children were taking pink eye medication.

159.   While acting at the behest of the Defendants and in conspiracy with them, the Colorado Agents disregarded the fear and suffering and chaos they could see they were imposing on Plaintiff, her siblings, her mother, and on Dr. and Mrs. G.

160.   While acting at the behest of the Defendants and in conspiracy with them, the Colorado Agents verbally informed the G.'s that government agents from Kansas would arrive at an unspecified time/day to take physical custody of the Doe children from Dr. and Mrs. G.

161.   In a subsequent phone conversation, Adame essentially admitted her knowledge that the seizure of the Doe children was illegal by stating to Dr. G. the words, or words to the effect that, "Something doesn't seem right."

162.   The G.'s assessed the situation of the children, who were weeping  from being forcibly deprived of their mother's companionship and care, and who were ill and in need of medical supervision to administer their prescription antibiotics.

163.   Based on the children's best interests, the G.'s personally transported the

ten Doe children to Kansas from Colorado, driving them all through the night, in order to protect the children from being further frightened and traumatized by the possibility of riding hours and hours with strangers/government agents from Kansas, who the Colorado agents had said would be arriving at some unspecified time to seize the children.

164.  The G.'s left a voice mail message with Adame to keep her informed about the children's whereabouts.

165.  The G.'s delivered the Doe children the next day to the custody of SRS/DCF in Johnson County, Kansas.

166.  The G.'s unselfishly asked SRS/DCF, in the best interest of the children, to place them all together in the G.'s temporary custody or in the custody of the children's paternal Grandparents.

167.  Rather than placing the children together in the G.'s custody or the Grandparents' custody, SRS/DCF disregarded the children's best interest and proceeded arbitrarily to separate them from each other, from their parents, from their paternal Grandparents, from the G.'s and from anyone known to them, causing the children obvious mental and physical anxiety, needless worry and grief.

168.  At the office of the SRS/DCF, personnel made false and outrageous statements maligning Mr. and Mrs. Doe in front of the Doe children and third parties.

169.  At the office of the SRS/DCF, personnel made false and outrageous claims, in the presence of the children and third parties, pronouncing that the children were about to be permanently taken from their parents, that Mr. and Mrs. Doe's parental rights were about to be terminated, and that all ten children would be permanently

adopted by different families.

170.    The actions by Gildner, Abney and Webb were not based on reasonable and articulable suspicion that Plaintiff or the other Doe children were being abused or neglected by their Parents or Grandparents, nor that they were in immediate danger or imminent peril of abuse.

171.    Any reliance by the Colorado Agents on the Kansas *Ex Parte* Orders (and their actions taken at the behest of the Defendants and in conspiracy with them) was unreasonable because said orders were patently defective on their face for reasons including but not limited to:

        a.    failing to identify a party to whom custody of the Doe children was being awarded;

        b.    failing to "specify facts" forming the basis for finding that "an emergency exists which threatens the safety of the [children];"

        c.    failing to state facts that a threat to the children's safety was "immediate;"

        d.    failing to order a duly authorized law enforcement officer to take custody of the Doe children;

        e.    failing to prohibit Mr. and Mrs. Doe from visitation or custody of their children.

172.    The *Ex Parte* Orders violated K.S.A. § 38-2242 (b)(1) by failing to set forth "facts" upon which "the court has determined there is probable cause to believe the allegations in the [verified] application are true."

173.    The *Ex Parte* Orders were "so lacking in indicia of probable cause as to

render official belief in its existence entirely unreasonable" by Defendants, who acted in conspiracy with Garza.

174.    At the time that Garza and Adame seized Plaintiff, clearly established law made it "incumbent" upon any officer executing seizure orders to "ensure that such seizure is lawfully authorized."

175.    No officer or social worker could have objectively believed that the Kansas *Ex Parte* Orders were lawfully authorized.

176.    The Kansas *Ex Parte* Orders had not been docketed by a Colorado court as required in C.R.S. § 14-11-101(4) and the Uniform Child Custody Jurisdiction and Enforcement Act, C.R.S. §14-13-301 *et. seq.* (the "UCCJEA").

177.    Garza knew no facts upon which to form a reasonable suspicion that the Doe children were abandoned, lost, or seriously endangered in such children's surroundings, or seriously endangering others, requiring immediate removal to be necessary for such children's protection or the protection of others;

178.    Garza knew no facts upon which to form a reasonable suspicion that the Doe children had run away or escaped from such children's parents, guardian, or legal custodian or that the children's parents, guardian, or legal custodian had not made a report to a law enforcement agency that the children had run away from home.

179.    Garza knew no facts upon which to form a reasonable suspicion that an arrest warrant had been issued for such children's parent or guardian on the basis of an alleged violation of C.R.S. § 18-3-304.

180.    In taking the Doe children into custody without a Colorado court order, Garza, acting at the behest of the Defendants and in conspiracy with them, violated

C.R.S. § 19-3-401 "Taking Children into Custody [by a law enforcement officer]".

181.   For purposes of obtaining an order of protective custody under C.R.S. § 19-3-405, Adame and Garza, acting at the behest of the Defendants and in conspiracy with them, knew no facts upon which to form a reasonable suspicion to believe that continuing the Doe children's care and custody with Mr. and Mrs. Doe would present a danger to the children's life or health in the reasonably foreseeable future.

182.   Adame and Garza, acting at the behest of the Defendants and in conspiracy with them, violated C.R.S. §19-3-405 by failing to obtain an order of protective custody from a Colorado court prior to seizing the Doe children.

183.   Adame and Garza, acting at the behest of the Defendants and in conspiracy with them, lacked any objectively reasonable basis for believing that the obviously defective Kansas *Ex Parte* orders were enforceable under the United States Constitution or Colorado law.

184.   At the time that Garza and Adame, acting at the behest of the Defendants and in conspiracy with them, executed upon the Kansas *Ex Parte* Orders by seizing Plaintiffs and their siblings, clearly established law required that authorities have an objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish probable cause that Plaintiff was being abused or neglected or that they were in imminent peril of abuse.

185.   Garza and Adame, acting at the behest of the Defendants and in conspiracy with them, acted with plain incompetence, or in knowing violation of the law, in executing upon the Kansas *Ex Parte* Orders without any objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish the

requisite probable cause.

186.   Defendants caused Plaintiff and her siblings to be kept in detention with foster families and were deprived of the love, care and companionship of their parents, paternal Grandparents, siblings and Dr. and Mrs. G. for five days following their seizure.

187.   By working together, either in meetings and over the phone and by other means of electronic communication, Defendants Gildner, Abney and Webb conspired and agreed with Adame and Garza to deprive Plaintiff of her rights as set forth above.

188.   Gildner's, Abney's and Webb's unconstitutional acts were the proximate cause of damages to Plaintiff in an amount to be proved at trial.

## FIRST CLAIM FOR RELIEF
### (Unlawful Seizure)

189.    Plaintiff incorporates by reference the foregoing allegations and further alleges:

190.   Without reasonable suspicion or probable cause, Gildner, Abney and Webb approved of and/or actively conspired in and conducted an unlawful seizure, within the State of Colorado and the State of Kansas, of the Doe children by which Plaintiff was deprived of her liberty without due process, both before and after the seizure, when she was prohibited by the Colorado Order, and the verbal orders described hereinabove, from any movement or travel with her mother, father and Grandparents, who owned a home nearby, and detained in foster care for five days.

191.   Under 42 U.S.C. § 1983, Gildner, Abney and Webb are liable for causing Plaintiff to be seized and deprived of her liberty in violation of the 4th Amendment of the United States Constitution.

## SECOND CLAIM FOR RELIEF
### (Unlawful 5-day Detention)

192.   Plaintiff incorporates by reference the foregoing allegations and further alleges:

193.   Gildner, Abney and Webb caused Plaintiff to be held against her will for five days prior to the hearing on the CINC petitions.

194.   Under 42 U.S.C. § 1983, Gildner, Abney and Webb are liable for causing Plaintiff to be detained against their will in violation of the 4th Amendment of the United States Constitution.

## THIRD CLAIM FOR RELIEF
### (Deprivation of Familial Association)

195.   Plaintiff incorporates by reference the foregoing allegations and further alleges:

196.   Gildner, Abney, and Webb intentionally or recklessly caused Plaintiff to be deprived of the love, affection, care, companionship and other tangible and intangible goods connected to Plaintiff's relationship with her Parents, siblings and Grandparents.

197.   Plaintiff's relationship with her Parents, siblings and Grandparents are familial relationships protected by the United States Constitution.

198.   Gildner, Abney and Webb had specific intent to separate Plaintiff from her Parents, siblings and Grandparent, as evidenced by: Gildner, Abney and Webb causing the filing of the CINC petitions to terminate Mr. and Mrs. Doe's parental rights; obtaining the *Ex Parte Orders* used to seize the Doe children in Colorado; communicating among themselves and with Adame and Garza to agree to execute upon the Kansas *Ex Parte Orders* in Colorado; acting together and communicating with each other to evict

31

Plaintiff's mother, Mrs. Doe, from the home of Dr. and Mrs. G. while prohibiting Plaintiff from leaving with her mother and while prohibiting Plaintiff, through written and verbal orders, from movement and travel with her mother, father and Grandparents; and by the fact that said Defendants knew their concerted actions could and did result in Plaintiff's detention.

199.   Gildner, Abney, and Webb directed their conduct and statements described above with knowledge they would adversely impact Plaintiff's familial relationships.

200.   In balancing Plaintiff's protected interests in her familial relationships with the interest of the government in Plaintiff's health and safety, Plaintiff's interests prevail against the said Defendants' unwarranted intrusion, described above, upon their rights.

201.   Under 42 U.S.C. § 1983, Gildner, Abney, and Webb are liable for causing Plaintiff to be deprived of her familial associations in violation of the 14th Amendment of the United States Constitution.

## FOURTH CLAIM FOR RELIEF
### (Conspiracy)

202.   Plaintiff incorporates by reference the foregoing allegations and further alleges:

203.   Gildner, Abney, Webb, Adame and Garza conspired and agreed with each other, as set forth hereinabove, and as more specifically set forth above, to deprive the Plaintiff of her rights set forth herein.

204.   Gildner, Abney, Webb, Adame and Garza were willing participants in acting together to deprive Plaintiff of their rights.

205.   Gildner, Abney, and Webb, are liable for their conspiracy with Adame and

Garza under 42.U.S.C. §1983, or in the alternative, under Kansas common law.

## FIFTH CLAIM FOR RELIEF
## (Exemplary Damages)

206.    Plaintiff incorporates by reference the foregoing allegations and further alleges:

207.    The actions of Gildner, Abney, Webb were attended by retaliation, malice, ill will, intent and/or recklessness, callous disregard of Plaintiff's rights, or indifference to Plaintiff's rights, such that Plaintiff is entitled to exemplary damages.

## SIXTH CLAIM FOR RELIEF
## (Deprivation of Right to Travel)

208.    Plaintiff incorporates by reference the foregoing allegations and further alleges:

209    Plaintiff was entitled under the Constitution to a right to travel to Colorado because no restriction on her travel or restriction on her Parent's custody of her had been imposed prior to the seizure, described above.

210.    In having Plaintiff seized, Defendants proximately caused Plaintiff to be deprived of her right to travel.

211.    Under 42 U.S.C. §1983, Defendants are liable to Plaintiff for the deprivation of her right to travel.

## SEVENTH CLAIM FOR RELIEF
## (Malicious Prosecution and/or Abuse of Process)

212.    Plaintiff incorporates by reference the foregoing allegations and further alleges:

213.    Defendants' actions in filing the CINC petitions and seeking the *Ex Parte* Orders and in having the *Ex Parte* Orders executed upon Plaintiff, by Adame and

Garza, were without probable cause to believe that Plaintiff met the definition of a "child in need of care" or that Plaintiff was in immediate danger at the time Defendants sought *Ex Parte* Orders or had Plaintiff seized by Adame and Garza.

214.   The CINC court found and made an entry into the court's minutes, after testimony by Gildner, that no probable cause existed for Plaintiff's removal from her Parents and Grandparents.

215.   Under 42 U.S.C. §1983, Defendants proximately caused damages to Plaintiff through their malicious prosecution, and or their abuse of process against them.

## JURY DEMAND

216.   Plaintiff demands a jury on all claims triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court will award:

A. Compensatory and/or general damages in the amount of $1,200,000.00;

B. Exemplary damages in an amount to be determined at trial;

C. Attorney's fees and costs; and

D. Such other and further relief that the Court deems just and proper.

Respectfully submitted,

MESSALL LAW FIRM, LLC

/s/ Rebecca R. Messall, Counsel for Plaintiff
Rebecca R. Messall, KS Bar no. 20305
7887 E. Belleview Avenue, Suite 1100
Englewood, CO  80111
Phone 303.228.1685
Fax 303.228.2281
Email: rm@lawmessall.com
www.lawmessall.com

Attachments
Exhibit 1 – Ex parte order
Exhibit 2 – Colorado order